#### IN THE UNITED STATES DISTRICT COURT
#### FOR THE SOUTHERN DISTRICT OF OHIO
#### EASTERN DIVISION

**MARY ELLEN POLLOCK,**

        **Plaintiff,**

  v.                                              Civil Action 2:20-cv-1853
                                                     Magistrate Judge Kimberly A. Jolson

**COMMISSIONER OF
SOCIAL SECURITY,**

        **Defendant.**

#### OPINION AND ORDER

Plaintiff, Mary Ellen Pollock, brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB"). The parties in this matter consented to the Undersigned pursuant to 28 U.S.C. § 636(c). (Docs. 9, 10). For the reasons set forth below, the Court **OVERRULES** Plaintiff's Statement of Errors and **AFFIRMS** the Commissioner's decision.

**I.    BACKGROUND**

On November 1, 2011, Plaintiff protectively filed an application for DIB alleging disability beginning May 10, 2011. (Tr. 85–101). Following several adverse decisions at the administrative level, Plaintiff appealed to this Court. (*Id.*; *see also Pollock v. Comm'r of Soc. Sec.*, No. 2:14-cv-1987 (S.D. Ohio)). In November 2014, after this Court upheld the Administrative Law Judge's ("ALJ") denial of Plaintiff's first application, Plaintiff again protectively filed an application for DIB, alleging disability beginning March 30, 2013. (Tr. 226–27). After this application was denied both initially and on reconsideration, the ALJ held a hearing on March 7, 2017. (Tr. 48–84). The ALJ denied Plaintiff's second application in a written decision on June 13, 2017. (Tr.

7–31). When the Appeals Council denied review, that denial became the final decision of the Commissioner. (Tr. 1–6).

Thereafter, on April 23, 2018, Plaintiff again appealed the final decision of the Commissioner in this Court. *See Pollock v. Comm'r of Soc. Sec.*, No. 2:18-cv-373 (S.D. Ohio). Upon the parties' joint motion, the Court remanded the case to the Commissioner. (Tr. 1116). After the Appeals Council issued a remand order (Tr. 1117–22), a hearing was held on November 20, 2019. (Tr. 1047–84). Plaintiff's application was denied again on January 28, 2020. (Tr. 1015–46). Plaintiff did not request review by the Appeals Council, opting instead to directly file the instant suit in this Court on April 10, 2020. (Doc. 1-1).

The Commissioner filed the administrative record on October 20, 2020 (Doc. 19), and Plaintiff filed her Statement of Errors (Doc. 20) on December 2, 2020. Shortly thereafter Defendant filed his opposition (Doc. 22) and Plaintiff filed her reply (Doc. 23). Thus, this matter is ripe for consideration.

Because Plaintiff's Statement of Errors (Doc. 20) pertains to only her physical impairments, the Court limits its analysis of the hearing testimony and medical records to the same.

### A. Relevant Hearing Testimony

The ALJ summarized the testimony from Plaintiff's most recent hearing:

> [Plaintiff] testified that she returned to work in 2017 and is still working. She indicated that she is often let go part way through the day; however, she also admitted that other workers are sent home early as well and it depends on seniority. She indicated she has Family and Medical Leave Act (FMLA), which allows her to take four days off a month (see also Exhibit B31E). At the hearing, the impartial vocational expert testified that missing four days of work per month on an ongoing basis would be accommodated work . . .

(Tr. 1022).

> At the most recent hearing, however, the [Plaintiff] indicated that she continues to have significant back pain despite now undergoing treatment, such as medication

2

> and injections. Though she noted the medication does not help, she indicated she continues to take it as it takes the edge off of the pain. The injections help for a couple hours after they are done, which [Plaintiff] indicated occurs once a week for six weeks. At the time of the hearing, [Plaintiff] indicated she had undergone a spinal cord stimulator trial, which helped her, and she was looking into getting a spinal cord stimulator permanently placed, but had not yet had that done due to money and time. She also indicated that her hands go numb, though she is not sure why.
>
> [Plaintiff] testified that she began work again in 2017, but she misses a lot of work, specifically she said two days a week every week, because of inflammation and pain in her back and because she has to attend doctor appointments. On the days she is not at work, she reported that she does not do chores around the house. She indicated that she has custody of her two grandchildren, ages six and eight, and has since 2016.

(Tr. 1028).

### B. Relevant Medical Evidence

The ALJ also usefully summarized Plaintiff's medical records and symptoms related to her physical impairments, beginning with early records from 2012 through 2015:

> The record supports that [Plaintiff] has a history of status post lumbar spine laminectomy/fusion and degenerative disc disease of the lumbar spine with retrolisthesis at L3-4 (Exhibits B1A, B4F). Specifically, a lumbar CT study performed in May 2012, following her January 2012 lumbar fusion surgery, revealed evidence of multilevel discogenic changes with postsurgical changes, with no evidence of hardware failure (Exhibit B4F). Imaging studies revealed evidence of mild to moderate bilateral neural foraminal narrowing at L4-L5 and at L3-L4, broad based disc bulges at L3-L4 and L4-L5, with a shallow posterior disc bulge at L5-S1. However, an electromyogram (EMG) study of her right leg performed in June 2012 revealed negative findings. Despite surgical intervention, [Plaintiff] continued to report pain and numbness symptoms extending into her legs. Thus, she was referred to pain management treatment (Exhibits B10F, B11F).
>
> For treatment of her symptoms, [Plaintiff] underwent a series of epidural lumbar steroid injections in August, September, and October of 2012 (Exhibits B10F/104; B11F/1, 2, 3). However, she reported minimal improvement with injections and she was thus referred for a spinal cord stimulator trial (Exhibit B10F/96). Specifically, the record reflects she underwent a spinal cord stimulator trial in December 2012. The record supports that [Plaintiff] reported good relief of symptoms with the spinal cord stimulator trial, at greater than 75% improvement (Exhibit B10F). In contradiction to the treatment notes, at the hearing [Plaintiff] testified that her improvement in symptoms was less significant. Further, she

> testified she did not have a permanent placement of a spinal stimulator due to difficulty with insurance approval for permanent placement and then she alleged she lost insurance for over a year.

(Tr. 1028–29).

> On August 14, 2013, [Plaintiff] was assessed for a Functional Capacity Evaluation by Tracy Hilts, PT, to determine disability for any occupation. [Plaintiff] was found to be unable to lift and carry up to 10 pounds and demonstrated a workday tolerance of only three to four hours a day (Exhibit B1F/1). She demonstrated occasional standing; walking; stair climbing; reaching at floor, desk, and overhead level; balancing; crouching; object handling; fingering; hand gasp; and gross hand manipulation. [Plaintiff] was unable to perform kneeling, crawling and stooping (Exhibit B1F/1-2). Based on her physiologic responses, the evaluator considered the results to be an accurate assessment of her abilities (Exhibit B1F/1).

> On May 21, 2014, Robert F. Shadel, M.D., who was board certified in occupational medicine, assessed [Plaintiff]'s current functional capabilities (Exhibit B3F/1). His assessment included a review of her file, in which he noted Ms. Hilts's August 2013 evaluation, as well as a peer review by Dr. Kerstman in December 2013. Dr. Shadel noted that Dr. Kerstman had opined [Plaintiff] could lift, carry, push and pull up to 10 pounds occasionally; sit for about 30 minutes at time; stand for about 15 minutes at a time; walk for up to 15 minutes at a time; and do occasional bending, kneeling, and squatting, and occasional reaching below waist level. Dr. Shadel also conducted his own exam and noted [Plaintiff] had a slow gait, diffuse tenderness throughout her lumbar region, restricted range of motion in her back, reduced sensation in her right leg, and abnormal reflexes. Dr. Shadel opined [Plaintiff] could stand and walk occasionally for 10-15 minutes, and up to one to two blocks at a time; and sit occasionally for 10-15 minutes at a time. She could lift approximately up to 10 pounds occasionally from waist level and 2 pounds from floor to waist level only occasionally. She could bend and climb stairs occasionally, never kneel or crawl, and frequently do hand gasping, manipulation, and repetitive motions (Exhibit B-3F).

(Tr. 1034–35).

> [T]he record reveals [Plaintiff] did not have further treatment with a spinal cord stimulator. Instead, she continued with pain management treatment throughout 2013-2015, which included pain medication treatment (valium, oxycodone, and Ambien) (Exhibits B9F/4, 13; B10F; B16F). Further, in November 2014, December 2014, and January 2015, the record supports she also participated in lumbar epidural steroid injections, lumbar medial branch nerve blocks, and a left shoulder injection (Exhibit B10F/5-17). Yet, despite ongoing treatment, throughout 2013 to 2015, [Plaintiff] continued to allege significant pain and

4

> numbness symptoms reportedly radiating from her back into her right lower extremity (Exhibit B10F/1).
>
> [I]n November 2014 [], [Plaintiff] underwent a physical consultative examination with Mark Weaver, M.D. (Exhibit B8F). Dr. Weaver interviewed, examined, and assessed [Plaintiff]. He observed on exam that [Plaintiff] had spasms in her lumbar paravertebral muscles and she had diffuse tenderness to palpation in her lower back. He also noted [Plaintiff] had some degree of restriction on range of motion in her dorsolumbar spine and a positive straight leg raise test. However, he found [Plaintiff] had intact sensation in her upper and lower extremities and her deep tendon reflexes were two-plus and equal in both upper and lower extremities.
>
> In April 2015, [Plaintiff's] pain management physician referred her to another pain management program for spinal cord implementation (Exhibit B16F/31). On June 18, 2015, she presented to her primary care physician, requested a referral to another pain management physician, and indicated that she did not want a spinal cord stimulator (Exhibit B17F/9). [Plaintiff] started treatment with a new pain management physician in August 2015 and she was referred to physical therapy for six weeks (Exhibit B12F/2). She also underwent an updated imaging study, which revealed evidence of an intact L4-L5 posterior instrumented fusion without instability on flexion or extension, but did show evidence of mild multilevel degenerative disc disease (Exhibit B12F/7).
>
> For treatment, [Plaintiff] participated in physical therapy and underwent EMG testing of the lower extremities (Exhibit B12F/20, 25-27). The EMG study performed in September 2015 was negative and [Plaintiff] was encouraged to continue with aquatic therapy (Exhibit B12F/25, 32). However, [Plaintiff] reported her pain was too severe with physical/aquatic therapy and she was discharged from therapy in October 2015 (Exhibit B12F/37).

(Tr. 1029). The ALJ then went on to discuss Plaintiff's medical records from 2017 through 2019:

> From October 2015 until February 2017 there was a break in treatment, which [Plaintiff] attributed to a loss of her health insurance []. On February 21, 2017, [Plaintiff] presented for chiropractic treatment (Exhibit B18F/3). In March 2017, she participated in chiropractic manipulations and trigger point injections (Exhibit B18F). Treatment notes from March 2017 and May 2017 show normal physical examinations (Exhibit B21F/94, 98). From July 2017 through December 2017, [Plaintiff] was noted to be ambulating normally with normal gait and station, though trace edema and abnormal monofilament testing was generally noted (Exhibit B21F/74, 79, 83). The same remained true through September 2018 (Exhibit B21F/54, 64, 69). The records also indicate that in [] October 2017 [] the clamant underwent a functional capacity evaluation, where she did not demonstrate the ability to meet the physical demand requirement for prior work, but she did demonstrate the ability to function in the medium physical demand category (Exhibit B25F).

5

> From late 2017 to late 2019, the records also indicate that [Plaintiff] continued with pain management, during which she underwent a number of injections, including medial branch blocks, and radiofrequency ablations (Exhibit B19F), B20F). In late 2018, [Plaintiff] underwent a psychological evaluation for spinal cord stimulator placement, during which she was found to be a good candidate (Exhibit B19F/20-21). At that time, her gait was also noted to be slow and antalgic. In early 2019, she underwent a spinal cord stimulator trial, with May 2019 treatment notes documenting 90 percent pain relief in the back and both legs, and with [Plaintiff] indicating that she wanted to proceed with permanent placement (Exhibit B19F/13).
>
> From May 2019 through August 2019, [Plaintiff] continued on pain medication and received branch blocks and ablations, with treatment notes from September 2019 indicating that her pain was controlled with medication (Exhibits B19F/3-4, 5, 8, 11-12; B20F). During this same time period from early 2019 through late 2019, treatment notes indicated that [Plaintiff]'s back pain was improving with injections (Exhibit B21F/35, 68). She was noted to ambulate normally and exhibit normal strength and tone with normal gait and station, but she also had trace edema of the bilateral lower extremities and abnormal monofilament testing along with limited range of motion of the lumbar spine with flexion (Exhibit B21F/4, 37, 41). Imaging from October 2019, however, showed right L3 nerve root and right L4 impingement at the L3 to 4 level along with some soft tissue present within the left side of the spinal canal at L4 to 5 (Exhibits B22F, B24F). At the time of the hearing, [Plaintiff] testified that though her spinal cord stimulator trial had helped, she had not yet had a permanent stimulator placed due to time and money.
>
> The records also show that [Plaintiff] has a history of bilateral carpal tunnel syndrome diagnoses and treatment (Exhibit B1A). However, she has not had recent testing or more than minimal treatment for this condition throughout the adjudicated period. More recent treatment notes indicate that [Plaintiff] complained of left-hand numbness and right elbow pain, with physical examinations revealing positive Phalen's signs on the left and tenderness to palpation over the lateral epicondyle of the right elbow (Exhibits B21F/4, 26-30; B23F). Abnormal monofilament testing was noted to the bilateral upper and lower extremities, and the [Plaintiff] was assessed with carpal tunnel syndrome of the left wrist and tendinitis of the right elbow.

(Tr. 1029–30).

### C. The ALJ's Decision

The ALJ found that Plaintiff last met the insured status requirement on December 31, 2019 and through that date Plaintiff engaged in substantial gainful activity during the following periods:

6

the fourth quarter of 2017 through the present. (Tr. 1022). The ALJ determined that, through the date last insured, Plaintiff suffered from the following severe impairments: status post lumbar spine laminectomy/fusion; degenerative disc disease of the lumbar spine with retrolisthesis L3/4; obesity; bilateral carpal tunnel syndrome; right elbow tendinitis; borderline intellectual functioning; depression; anxiety; and, post-traumatic stress disorder (PTSD). (Tr. 1023). Ultimately, however, the ALJ found that, through the date last insured, none of Plaintiff's impairments, either singly or in combination, met or medically equaled a listed impairment. (Tr. 1024).

As to Plaintiff's residual functional capacity ("RFC"), the ALJ found that, through the date last insured, the Plaintiff had the residual functional capacity to perform light work, limited to standing and walking for four hours out of an eight-hour workday. (Tr. 1026). The ALJ further found that Plaintiff could frequently handle, finger, and feel; balance; and, climb ramps and stairs, and could occasionally stoop; kneel; crouch; and, crawl, but could not climb ladders, ropes, or scaffolds. Plaintiff would be capable of simple, routine, and repetitive tasks, involving only simple workplace decisions and with few, if any, workplace changes. (*Id*.).

Upon "careful consideration of the evidence," the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record . . . " (Tr. 1028). In making this determination, the ALJ specifically determined that the opinions of Tracy Hilts, PT and Robert F. Shadel, M.D. were entitled to "little weight" as "the evidence [did] not support the extreme limitations as opined." (Tr. 1035). Specifically, the ALJ opined:

> [Plaintiff] participated in numerous objective examinations throughout the record which revealed evidence of intermittent positive findings such as an antalgic gait, decreased strength, tenderness to palpation of the spine, a positive straight leg raise test, and decreased range of motion (Exhibits B1F, B3F, B6F, B8F, B12F/9,

7

>B10F/1, 6, 25, 28, 46, 49, 56, 62-72; B13F/58). However, at other exams, the [Plaintiff] was noted to have had a normal gait (albeit slow at times) (Exhibits B3F; B5F/1; B12F/9; B21F; B23F), normal strength, (Exhibits B10F/1, 25, 46; B12F/9; B21F), normal sensation (Exhibits B8F; B10F/1, 5-6, 13, 25, 46; B12F/9; B13F/58), negative straight leg raise tests (Exhibit B12F/9), and a normal range of motion (Exhibit B13F/58). Relief was noted with medication and the spinal cord stimulator trial; however, more recent imaging did show nerve root involvement and a permanent stimulator has yet to be placed. Still, the undersigned finds that the extreme limitations provided by Ms. Hilts and Dr. Shadel are not consistent with the fact that [Plaintiff] returned to work. As the evidence does not suggest medical improvement, it can be inferred that [Plaintiff] always had this functional capacity. In considering the totality of the evidence, as well as [Plaintiff]'s own reports, the undersigned finds it appropriate to limit [Plaintiff] to the above residual functional capacity, which includes a reduced range of light work.

(*Id.*).

The ALJ concluded that, through her date last insured, Plaintiff was unable to perform her past relevant work as a mail clerk. (Tr. 1037). Relying on the vocational expert's testimony, the ALJ found that, through her date last insured, Plaintiff could perform other jobs in the national economy such as tacking machine tender, storage facility rental clerk, or a production line solderer. (Tr. 1038). He therefore concluded that Plaintiff was not disabled within the meaning of the Social Security Act, at any time from her alleged onset date through her date last insured. (Tr. 1039).

**II.    STANDARD OF REVIEW**

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

8

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

### III. DISCUSSION

In her sole assignment of error, Plaintiff argues that the ALJ failed to properly evaluate the opinions of Robert F. Shadel, M.D. and Tracy Hilts, PT. (Doc. 20 at 9–14). Upon closer review however, Plaintiff's argument is more clearly that the conclusions underpinning her RFC were not supported by substantial evidence. (*See generally id.*). In addition to allegedly failing to properly evaluate these two opinions, Plaintiff argues that in determining her RFC the ALJ "repeatedly use[d] Plaintiff's heavily accommodated part-time work []against her" and mischaracterized her use of a spinal cord stimulator as prescribed treatment. (*Id.* at 11–14). The Court addresses each argument in turn.

#### A. Dr. Shadel

At the outset, in order to determine the appropriate weight Dr. Shadel's opinion should be afforded, it is important to identify which type of medical source he is. "The Social Security Administration defines three types of medical sources: non-examining sources, non-treating (but examining) sources, and treating sources." *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 273 (6th Cir. 2015) (citing 20 C.F.R. § 404.1502). When the opinion comes from a non-treating or non-examining source, it is usually not entitled to controlling weight. 20 C.F.R. § 404.1527(c)(2).

9

Rather, the ALJ should consider relevant factors, including supportability, consistency, and specialization. 20 C.F.R. § 404.1527(d)(2). There is however, no "reasons-giving requirement" for non-treating source opinions. *Martin v. Comm'r of Soc. Sec.*, 658 F. App'x 255, 259 (6th Cir. 2016). Rather, the ALJ must provide only "a meaningful explanation regarding the weight given to particular medical source opinions." *Mason v. Comm'r of Soc. Sec.*, No. 1:18 CV 1737, 2019 WL 4305764, at *7 (N.D. Ohio Sept. 11, 2019) (citing SSR 96-6p, 1996 WL 374180, at *2).

As Plaintiff concedes, Dr. Shadel is a non-treating (but examining) medical source. (Doc. 20 at 10). Therefore, the ALJ is required only to provide "a meaningful explanation regarding the weight given" to Dr. Shadel's opinion. *Id*. Plaintiff argues the ALJ failed to do this. The Court disagrees.

In affording Dr. Shadel's opinion "little weight," the ALJ determined that "the evidence d[id] not support the extreme limitation[s] as opined." (Tr. 1035). During his May 2014 internal medical assessment of Plaintiff, Dr. Shadel found that she had a slowed (but non-antalgic) gait, diffuse tenderness throughout her lumbar region, restricted range of motion in her back, reduced sensation in her right leg, and abnormal reflexes. (Tr. 374–77). While the ALJ noted these contentions, he concluded that they were inconsistent with other evidence in the record. (Tr. 1035). Specifically, he noted that "at other exams, the claimant was noted to have had a normal gait (albeit slow at times), normal strength, normal sensation, negative straight leg raise tests, and a normal range of motion." (*Id*.).

Upon review, these conclusions are an accurate representation of both Dr. Shadel's opinion and the other medical evidence on the record. For example, as the ALJ opined, there are multiple instances in the record where Plaintiff was observed to have a normal gait, normal strength, normal range of motion and normal sensation. (*See* Tr. 381, 1325, 1331, 1428 (noting Plaintiff's normal

gait); *see also* Tr. 446, 705–08, 1415, 1419 (noting Plaintiff's normal strength); Tr. 718 (noting Plaintiff's normal range of motion); Tr. 446, 450-51, 458-59, 470-71, 491-92, 629, 718-19 (noting Plaintiff's normal sensation)). Based on this review of the record, the Court is satisfied that the ALJ provided meaningful explanations, supported by substantial evidence, for his decision to afford Dr. Shadel's opinion little weight. *Mason*, 2019 WL 4305764, at *7 (citing SSR 96-6p, 1996 WL 374180, at *2). As a result, he did not err in his evaluation of this non-treating (but examining) medical source opinion.

Furthermore, Plaintiff's contentions that the ALJ mischaracterized evidence or engaged in selective citation are unfounded. The Court finds that this is not a case where the ALJ overlooked medical evidence supporting a symptom or condition. *See Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 435 (6th Cir. 2013) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis). Instead, the ALJ weighed the evidence in its entirety and concluded that Dr. Shadel's opinion was entitled to little weight. (Tr. 1034–35); *see also, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009) ("[W]e see little indication that the ALJ improperly cherry picked evidence; the same process can be described more neutrally as weighing the evidence.").

### B. Ms. Hilts

Second, Plaintiff argues that the ALJ erred when he afforded the opinion of physical therapist Tracy Hilts little weight. (*See* Doc. 20 at 9–14). The Court disagrees.

While an ALJ must "evaluate every medical opinion" regardless of its source, only "acceptable medical sources" may offer medical opinions. 20 C.F.R. §§ 416.927(a)(2), 416.927(c). A physical therapist like Ms. Hilts, is not an "acceptable medical source," but rather

11

an "other source." *See* SSR 06–03p, 2006 WL 2329939, at *2[1]; *see also Noto v. Comm'r of Soc. Sec.*, 632 Fed. App'x. 243, 249 (6th Cir. 2015) (finding that Plaintiff's physical therapist was a "non-acceptable medical source"). In evaluating statements from "other sources," the ALJ is not required to weigh the factors set forth in 20 C.F.R. § 404.1527, but rather must simply "consider" these opinions. *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 378 (6th Cir. 2013) (quoting SSR 06–03p, 2006 WL 2329939, at *2). This standard is not demanding. *See Hickox v. Comm'r of Soc. Sec.*, No. 1:09-cv-343, 2010 WL 3385528, at *6–7 (W.D. Mich. Aug. 2, 2010) (finding that the ALJ fulfilled the consideration requirement by "expressly consider[ing] the opinions offered by an [other source]"); *see also Clark ex rel. S.R.C. v. Comm'r of Soc. Sec.*, No. 5:12CV1745, 2013 WL 3007154, at *9 (N.D. Ohio June 11, 2013) (finding the consideration requirement satisfied where the ALJ "plainly did not ignore the [other source]'s opinion").

In the instant case, the ALJ clearly "considered" Ms. Hilts' opinion and more than meaningfully discussed her treatment notes. Specifically, the ALJ spent a full paragraph overviewing Ms. Hilts' Function Capacity Evaluation of Plaintiff:

> On August 14, 2013, [Plaintiff] was assessed for a Functional Capacity Evaluation by Tracy Hilts, PT, to determine disability for any occupation. [Plaintiff] was found to be unable to lift and carry up to 10 pounds and demonstrated a workday tolerance of only three to four hours a day. She demonstrated occasional standing; walking; stair climbing; reaching at floor, desk, and overhead level; balancing; crouching; object handling; fingering; hand gasp; and gross hand manipulation. [Plaintiff] was unable to perform kneeling, crawling and stooping.

(Tr. 1034). Thereafter, the ALJ explained how these findings were inconsistent with the record, and accordingly afforded the opinion little weight. (Tr. 1035). This evaluation more than meets the "consideration" requirement imposed under SSR 06–03p. *Noto*, 632 Fed. App'x. at 249

---

[1] This regulation has been rescinded. It still applies, however, to claims (like this one) filed before March 27, 2017. 20 CFR § 404.1527.

12

(holding that the ALJ had "considered" a physical therapist's opinion where she determined that the opinion was inconsistent with the record); *see also McGee v. Comm'r of Soc. Sec.*, No. 1:17CV2645, 2018 WL 6570681, at *6 (N.D. Ohio Nov. 26, 2018) (finding the ALJ appropriately considered a physical therapist's opinion, where he explicitly discussed the opinion and afforded it some weight).

Ultimately, although Plaintiff may disagree with how the ALJ weighed Ms. Hilts' opinion, she has not shown that the ALJ's analysis was outside the ALJ's permissible "zone of choice" that grants ALJs discretion to make findings without "interference by the courts." *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009).

### C. Other Alleged Errors

As discussed above, in addition to allegedly failing to properly evaluate these two opinions, Plaintiff argues that in determining her RFC the ALJ repeatedly used Plaintiff's reported activity "as a club against her" and mischaracterized her use of a spinal cord stimulator as prescribed treatment. (*Id*. at 11–14). The Court addresses each argument in turn. First, however, it is important to set out the standard for determining a claimant's RFC.

A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from her impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); see also 20 C.F.R. §§ 404.1545(a), 416.945(a). The Social Security regulations, rulings, and Sixth Circuit precedent provide that the ALJ is charged with the final responsibility in determining a claimant's residual functional capacity. *See, e.g.*, 20 C.F.R. § 404.1527(d)(2) (the final responsibility for deciding the residual functional capacity "is reserved to the Commissioner"). This includes resolving conflicts in the medical evidence. *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984). When determining a claimant's RFC, an ALJ is charged with

13

evaluating several factors, including the medical evidence (not limited to medical opinion testimony), and the claimant's testimony. *Henderson v. Comm'r of Soc. Sec.*, No. 1:08-cv-2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010) (citing *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004)).

### 1. Plaintiff's Reported Activity

Plaintiff argues that "the ALJ repeatedly uses [her] heavily accommodated part-time work activity as a club against her." (Doc. 20 at 13). Specifically she asserts that her "part-time work activity is no indicator of her ability to perform work eight-hours per day, five days per week on a sustained basis[,]" and that the ALJ's rational here is "internally inconsistent." (Doc. 23 at 4). Conversely, Defendant contends that "the ALJ did not equate Plaintiff's activities with fulltime work . . . [and] [] reasonably considered Plaintiff's reported activities" in crafting her RFC. (Doc. 22 at 7).

When evaluating Plaintiff's part time work the ALJ found that "the evidence of record d[id] not support [her] subjective complaints." (Tr. 1033). Furthermore he opined:

> [T]he records indicate that the claimant returned to work in 2017 at the light exertional level. While she testified that she was frequently sent home early and has FMLA that lets her take up to four days off per month, this still shows significantly more functional capacity than alleged. Notably, the claimant did not report any significant improvement related to her return to work, which shows that her capacity to do this work has not changed.
>
> The claimant's allegations that she cannot perform any work is also inconsistent with the fact that throughout the adjudicated period she performed a variety of activities, such as completing household chores, shopping (with help), driving (for some of the adjudicated period), and helping to provide care for up to six grandkids on an intermittent but full-time basis

(*Id.*; *see also* Tr. 56, 345, 1022–23).

It is "entirely appropriate for the ALJ to consider Plaintiff's ability to perform part-time work when evaluating Plaintiff's symptoms for purposes of developing an RFC." *Mosed v.*

14

*Comm'r of Soc. Sec.*, 2016 WL 1084679 at * 2 (E.D. Mich. Mar. 21, 2016); *see also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997) ("An ALJ may also consider household and social activities engaged in by the claimant in evaluating a claimant's assertions of pain or ailments."). This is precisely what occurred here. In crafting Plaintiff's RFC, the ALJ repeatedly found that Plaintiff's alleged symptoms and functional capacity, were inconsistent with the records from the adjudicated period. (Tr. 1032–33). As a result, "the ALJ's finding that [P]laintiff's part-time work activity was inconsistent with [her] allegations of debilitating pain and functional restrictions is supported by substantial evidence, and the Court must therefore defer to it." *Williamson v. Comm'r. of Soc*. Sec., No. 1:16-cv-583, 2017 WL 713904 at *3 (S.D. Ohio Feb. 23, 2017).

### 2. Prescribed Treatment

In his opinion, the ALJ notes that Plaintiff saw "relief [] with medication and the spinal cord stimulator trial." (Tr. 1035). Plaintiff takes issue with this claim, arguing that it is unsupported by the record and inconsistent with Plaintiff's testimony. (Doc. 20 at 12). Specifically, Plaintiff argues that the spinal cord stimulator was not permanently placed at the time of the decision, due to Plaintiff's inability to afford such treatment. (*Id*.). She further argues that "[t]o any extent the ALJ is using this as a failure to follow prescribed treatment . . ." that would be inconsistent with SSR 82-59. Defendant counters these allegations by arguing that SSR 82-59 does not apply in this instance and nonetheless, the ALJ appropriately considered Plaintiff's use of the spinal cord stimulator. (Doc. 22 at 8–9).

First, Defendant is correct, SSR 82-59 does not apply here. "Failure to follow prescribed treatment [as recognized in SSR 82-59] becomes a determinative issue only if the claimant's impairment is found to be disabling under steps one through five and is amenable to treatment

15

expected to restore her ability to work." *Hester v. Sec. of HHS*, No. 89-5207, 1989 WL 115632, at *3 (6th Cir. 1989). Here, there has been no finding of disability. In fact, the foundation of Plaintiff's claim is that the ALJ erred in finding she was not disabled. (Tr. 1018). Accordingly, Plaintiff's argument that the ALJ erred by failing to follow SSR 82-59 has no merit. *See Bozarth v. Astrue*, 2013 WL 456483, at * 15 (M. D. Tenn., Feb. 2013) ("A precondition to the applicability of SSR 82–59 is that the ALJ determine that the plaintiff was disabled. The ALJ did not determine that the plaintiff was disabled. Therefore, SSR 82–59 is inapposite to the facts of this case.").

Furthermore, the ALJ appropriately considered Plaintiff's use the spinal cord stimulator in crafting her RFC. First, the ALJ thoroughly discussed the timeline of Plaintiff receiving this treatment, noting that while Plaintiff underwent a trial use of the stimulator, she ultimately decided against permanent placement given the costs. (Tr. 1028). Plaintiff's contention that the ALJ is punishing her for an inability to afford treatment, is unfounded. (Doc. 20 at 12). While the ALJ does note Plaintiff's reported relief with the stimulator, he does not "punish" plaintiff for not pursing that course of treatment. In fact, he specifically states that while she saw some relief, "more recent imaging did show nerve root involvement and a permanent stimulator has yet to be placed." (Tr. 1035).

At base, her intermittent use of a spinal cord stimulator was only one factor amongst many the ALJ considered in determining that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record." (Tr. 1028). It is well within the ALJ's discretion to consider Plaintiff's "lack of treatment in assessing her credibility." *Williams v. Comm'r of Soc. Sec.*, No. 3:13-cv-1276, 2014 WL 1406433, at *13 (N.D. Ohio Apr. 2014)("It was not error to include [plaintiff]'s non-compliance as one of factor in the overall determination of her credibility.").

16

Accordingly, as illustrated above, the ALJ provided meaningful explanations, supported by substantial evidence, when crafting Plaintiff's RFC. Considering her use, or non-use, of a specific treatment in making that determination is not an error. *Id.*; *see also Ranellucci v. Astrue*, No. 3:11-cv-00640, 2012 WL 4484922, at *11 (M. D. Tenn. Sept.27, 2012).

### IV. CONCLUSION

For the reasons set forth above, the Court **OVERRULES** Plaintiff's Statement of Errors and **AFFIRMS** the Commissioner's decision.

IT IS SO ORDERED.


Date: March 12, 2021 /s/ Kimberly A. Jolson
KIMBERLY A. JOLSON
UNITED STATES MAGISTRATE JUDGE